# EXHIBIT 1

**Chelsea D. Franklin**

| | |
|---|---|
| **From:** | Chelsea D. Franklin |
| **Sent:** | Thursday, August 26, 2010 4:47 PM |
| **To:** | 'newcases@ca2.uscourts.gov' |
| **Cc:** | 'mailto:linda.dreeben@nlrb.gov'; 'mailto:linda.leslie@nlrb.gov'; 'mailto:jgleason@hhk.com'; 'appellatecourt@nlrb.gov' |
| **Subject:** | Sent on behalf of James R. LaVaute |
| **Attachments:** | PETITION FOR REVIEW 8-26-2010.pdf; EXHIBIT A FOR PETITION 8-26-2010.pdf; CERTIFICATE OF SERVICE 8-26-2010.pdf |

Please see attached Petition for Review plus exhibit and Certificate of Service, on behalf of the Local Union 36, International Brotherhood of Electrical Workers, AFL–CIO.  Please advise if you have any questions or concerns.


**Chelsea D. Franklin**
Legal Secretary
For James R. LaVaute (admitted to the Second Circuit in 1981)

## BLITMAN & KING LLP

Franklin Center, Suite 300
443 North Franklin Street
Syracuse New York 13204-5412

T: 315.422.7111 | F: 315.471.2623 | E: *cdfranklin@bklawyers.com* | *www.bklawyers.com*

**Confidentiality Notice:** This electronic mail transmission is intended solely for the use of the individual or entity to which it is addressed and may contain confidential and/or privileged information which is protected by the attorney-client or other privileges. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this transmission in error, Please notify the sender immediately by e-mail and delete the original message.

**IRS Circular 230 Disclosure:** To comply with recent IRS rules, we must inform you that this message, and any attachments, if they contain advice relating to federal taxes, are not intended or written to be used, and they cannot be used for (1) the purpose of avoiding penalties that may be imposed under federal tax law; or (2) promoting, marketing or recommending to another party any tax-related matter addressed herein. Under these IRS rules, a taxpayer may rely on professional advice to avoid federal tax penalties only if that advice is reflected in a comprehensive tax opinion that conforms to stringent requirements under federal law.

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

|  |  |  |
|---|---|---|
| Local Union 36, International Brotherhood of Electrical Workers, AFL–CIO, | ) ) ) ) | |
| Petitioner, | ) ) | **PETITION FOR REVIEW** |
| v. | ) ) | Docket No. _____ |
| National Labor Relations Board, | ) ) ) | |
| Respondent. | ) ) ) | |

Petitioner Local Union 36, International Brotherhood of Electrical Workers, AFL–CIO, hereby petitions the United States Court of Appeals for the Second Circuit for review of the Decision and Order of Respondent National Labor Relations Board entered on the 16th day of August 2010 (attached as "Exhibit A"). Specifically, Petitioner seeks review of (a) Respondent's finding that the complaint did not allege that the employer refused to bargain over its decision to discontinue the practice of allowing employees to drive company vehicles to and from work, (b) Respondent's failure to find a decision bargaining violation, and (c) the remedy ordered by Respondent as to the effects bargaining violation that it did find.

Dated: August 26, 2010

BLITMAN & KING LLP

/s/  James R. LaVaute
James R. LaVaute, Esq.
*Attorneys for Petitioner*
Franklin Center, Suite 300
443 North Franklin Street
Syracuse, New York 13204
Telephone: (315) 422-7111
Facsimile:  (315) 471-2623
jrlavaute@bklawyers.com

# EXHIBIT A

NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.

**Rochester Gas & Electric Corporation** *and* **Local Union 36, International Brotherhood of Electrical Workers, AFL–CIO.** Case 3–CA–25915

August 16, 2010

DECISION AND ORDER

BY CHAIRMAN LIEBMAN AND MEMBERS SCHAUMBER AND BECKER

On June 12, 2008, Administrative Law Judge Wallace H. Nations issued the attached decision. The Respondent filed exceptions and a supporting brief, the General Counsel and Charging Party Union each filed an answering brief, and the Respondent filed a reply brief. The Charging Party filed cross-exceptions and a supporting brief, the General Counsel and Respondent each filed an answering brief, and the Charging Party filed a reply brief.

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

The Board has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings, and conclusions and to adopt the recommended Order as modified and set forth in full below.[1] The judge found, and we agree, that the Respondent violated Section 8(a)(5) and (1) of the Act by refusing to provide the Union with certain information and by refusing to bargain over the effects of its decision to discontinue its practice of allowing employees to drive company vehicles to and from work.[2]

1. The Union, the Charging Party in this proceeding, filed a motion to strike portions of the Respondent's answering brief. For the following reasons, we find it unnecessary to pass on the motion.

First, the Union, which contends that the General Counsel did not withdraw his allegation that the Respondent refused to engage in decisional bargaining, moves to strike the Respondent's contention that the General Counsel's posthearing brief supports the judge's finding that the allegation was withdrawn. In affirming the judge's finding that the General Counsel withdrew the allegation, we find it unnecessary to consider the General Counsel's posthearing brief. Therefore, we need not pass on the motion to strike references to it.

Second, the Charging Party moves to strike portions of the Respondent's argument that the decision to change its vehicle practice was lawful. Having found that the decisional-bargaining allegation was withdrawn, we do not consider that argument on the merits, and therefore we need not pass on the motion to strike those portions of the Respondent's argument.

Finally, the Charging Party moves to strike certain statements supporting the Respondent's argument that the case should be deferred to the parties' contractual arbitration procedure. Even if we were to consider those statements, we would adopt the judge's decision not to defer, as stated below. Therefore, we need not pass on the motion to strike the statements.

2. We agree with the judge that the Respondent unlawfully refused to bargain over the effects of its decision to discontinue the practice of allowing employees to take company vehicles home from work.[3] *Noblit Bros.*, 305 NLRB 329 (1992), cited by the Respondent, is distinguishable. In *Noblit*, the Board found that the union never requested effects bargaining; rather, the union's bargaining demands were aimed at reversing a decision to change the scope and direction of the enterprise, a nonmandatory subject of bargaining, not at obtaining "adjustments in the employees' terms and conditions in the wake of that change." Id. at 330 fn. 10. In support of that finding, the Board noted that the briefs of both the General Counsel and the union characterized the union's bargaining requests as relating to the decision rather than its effects. Id. In the present case, by contrast, the Union's references to the monetary impact of the decision and to making employees whole show that the Union was seeking to negotiate over the effects of the decision. Moreover, unlike in *Noblit*, both the Union and the General Counsel argue in their briefs that the Union implicitly demanded effects bargaining as well as decisional bargaining.[4]

---

[1] We shall modify the judge's remedy to better effectuate the policies of the Act. We shall also modify his recommended Order and substitute a new notice to conform to the violations found and to the Board's standard remedial language.

[2] The original complaint alleged that the Respondent also violated Sec. 8(a)(5) and (1) by refusing to bargain over its decision to discontinue the vehicle practice. We affirm the judge's finding that the General Counsel's amendment to the complaint withdrew the decisional-bargaining allegation. We observe, however, that the amendment was made before the hearing, not, as the judge stated, at the hearing.

[3] In doing so, we do not rely on *AT&T Corp.*, 325 NLRB 150 fn. 1 (1997), or *Yellow Cab Co.*, 229 NLRB 1329 (1977), enfd. in part 603 F.2d 862 (D.C. Cir. 1978), both of which were cited by the judge.

[4] We affirm the judge's finding that the Union did not waive its right to effects bargaining. Although Member Schaumber adheres to his position that the Board should apply a "contract coverage" test rather than the "clear and unmistakable waiver" standard, see *California Offset Printers*, 349 NLRB 732, 737 (2007) (Member Schaumber, dissenting), he acknowledges that no Board majority currently exists to adopt the contract coverage standard. Accordingly, for institutional reasons, Member Schaumber joins in adopting the judge's waiver analysis.

355 NLRB No. 86

2                   DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

AMENDED REMEDY

Having considered the Respondent's exception, we conclude that a remedy similar to that in *Transmarine Navigation Corp.*, 170 NLRB 389 (1968), is more appropriately tailored to the violation and will better effectuate the policies of the Act.

A *Transmarine* remedy, typically granted when an employer fails to bargain over the effects of closing a facility or otherwise removing work from the bargaining unit, requires the employer to bargain over the effects of its decision and to provide employees with limited backpay from 5 days after the date of the Board's decision until the occurrence of one of four specified conditions. See *Transmarine*, supra at 390, as clarified in *Melody Toyota*, 325 NLRB 846, 846 (1998); *Gannett Co.*, 333 NLRB 355 (2001); *Sea-Jet Trucking Corp.*, 327 NLRB 540 (1999), enfd. 221 F.3d 196 (D.C. Cir. 2000) (per curiam). The *Transmarine* remedy is "designed both to make whole the employees for losses suffered as a result of the violations and to recreate in some practicable manner a situation in which the parties' bargaining position is not entirely devoid of economic consequences for the Respondent[]." *Liberty Source W*, 344 NLRB 1127, 1128 (2005), enfd. 478 F.3d 172 (3d Cir. 2007), cert. denied 552 U.S. 818 (2007). *Transmarine* is the standard remedy in effects-bargaining cases. *Stevens International*, 337 NLRB 143, 144 (2001).

Here, as in *Transmarine* and its progeny, the Respondent violated its legal obligation to engage in timely bargaining about the effects on the employees of its decision to discontinue the vehicle benefit. Although the Respondent's decision to discontinue the benefit did not result in the loss of jobs, as with the partial closing at issue in *Transmarine*, it did cause unit employees to incur economic losses in the form of increased commuting costs. As the Board observed in *Transmarine*, 170 NLRB at 389, the Respondent's unfair labor practice thus deprived the Union of "an opportunity to bargain . . . at a time prior to [implementation of the decision] when such bargaining would have been meaningful in easing the hardship on employees . . . ." In *Gannett*, above, the Board observed, "the Union may have been able to secure 'ad-

ditional benefits for employees had the Respondent engaged in timely effects bargaining.'" 333 NLRB at 359 (quoting *Live Oak Skilled Care & Manor*, 300 NLRB 1040 (1990)).

Several years have now passed since the vehicle benefit was discontinued, and we cannot determine the result that timely effects bargaining would have produced. Moreover, we cannot order the Respondent to restore the benefit because, as the Respondent points out, it acted lawfully when it unilaterally implemented the decision to discontinue the benefit. However, were we to merely order that the Respondent now engage in effects bargaining, "the Union can hardly hope to obtain the same benefits from bargaining that might have helped ease the unit employees' transition . . . had 'effects' bargaining taken place at the time required by law." *Gannett*, above, at 359 (quoting *Signal Communications*, 284 NLRB 423, 428 (1987)). As in *Transmarine*, above, "a bargaining order alone cannot serve as an adequate remedy for the unfair labor practices committed by the Respondent." 170 NLRB at 390. At this point, meaningful bargaining cannot be assured without restoring some measure of bargaining power to the Union in relation to the issue.

Accordingly, in order to ensure that meaningful bargaining occurs and to effectuate the policies of the Act, we shall order the Respondent to bargain over the effects of its decision and to provide employees with a limited and conditional make-whole remedy similar to that required in *Transmarine*, above. Specifically, we shall order the Respondent to pay each employee the monetary value of the vehicle benefit from 5 days after the date of this Decision and Order until the occurrence of the earliest of the following conditions: (1) the Respondent bargains to agreement with the Union on the effects of discontinuing the benefit; (2) the parties reach a bona fide impasse in bargaining; (3) the Union fails to request bargaining within 5 business days after receipt of this Decision and Order, or to commence negotiations within 5 business days after receipt of the Respondent's notice of its desire to bargain with the Union; or (4) the Union subsequently fails to bargain in good faith. The sum paid to each employee shall not exceed the monetary value of the vehicle benefit to that employee from January 1, 2006 (the date the benefit was discontinued) until the date on which the Respondent shall have offered to bargain in good faith. However, in no event shall the sum paid to any employee be less than the monetary value of the benefit to that employee for a 2-week period.[5] The amounts due shall be computed in accordance with *Ogle*

---

We also adopt the judge's decision not to defer to the parties' contractual arbitration procedure. In doing so, we find it unnecessary to pass on the Union's argument that the contractual procedure improperly requires employees to waive their statutory rights. Member Schaumber would find that information-request allegations, if covered by a contractual arbitration clause, are deferrable. He recognizes, however, that Board precedent is to the contrary. See *Team Clean, Inc.*, 348 NLRB 1231 fn. 1 (2006). And, in any event, Member Schaumber acknowledges that the effects-bargaining and information allegations here are not covered by the contractual arbitration clause, and therefore are not deferrable.

[5] We leave to compliance the determination of the monetary value of the vehicle benefit to each affected employee.

*Protection Service*, 183 NLRB 682, 683 (1970), enfd. 444 F.2d 502 (6th Cir. 1971), with interest as prescribed in *New Horizons for the Retarded*, 283 NLRB 1173 (1987).

ORDER

The National Labor Relations Board orders that the Respondent, Rochester Gas & Electric Corp., Rochester, New York, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Refusing to bargain with Local Union 36, International Brotherhood of Electrical Workers, AFL–CIO (the Union), over the effects of eliminating the benefit of allowing the low-voltage trouble maintenance and repair (TM&R) employees to take their service vehicles home at the end of their shifts.

(b) Failing and refusing to provide the Union with requested information that is relevant and necessary to the Union's performance of its duties as the exclusive collective-bargaining representative of employees in the unit described below, and/or failing to inform the Union that the requested information did not exist.

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) On request, bargain collectively with the Union as the exclusive representative of the employees in the following appropriate unit concerning the effects of the Respondent's decision to discontinue the benefit of allowing the low-voltage TM&R employees to take their service vehicles home after work, and if an understanding is reached, embody the understanding in a signed agreement:

> All employees of Respondent described in Section 1—Representation and Recognition, of the collective-bargaining agreement between the Respondent and the Union, which is effective from September 1, 2003 to May 31, 2008.

(b) Pay each low-voltage TM&R employee the monetary value of his or her vehicle benefit, with interest, for the period set forth in the remedy section of this decision.

(c) Furnish the Union with the information it requested on March 7 and June 5, 2006, namely, the cost of allowing the bargaining unit employees to have the benefit of taking a company vehicle home, a listing of all nonunit employees who have the benefit of taking a company vehicle home, and whether the Respondent announced to

any nonunit employees that the benefit would be discontinued.

(d) Preserve and, within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and reports, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of money due under the terms of this Order.

(e) Within 14 days after service by the Region, post at its facility in Rochester, New York, copies of the attached notice marked "Appendix."[6] Copies of the notice, on forms provided by the Regional Director for Region 3, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since January 10, 2006.

(f) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps the Respondent has taken to comply.

Dated, Washington, D.C.  August 16, 2010

| | |
|---|---|
| Wilma B. Liebman, | Chairman |
| Peter C. Schaumber, | Member |
| Craig Becker, | Member |

(SEAL)          NATIONAL LABOR RELATIONS BOARD

---

[6] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board"

4                              DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT refuse to bargain with Local Union 36, International Brotherhood of Electrical Workers, AFL–CIO (the Union), over the effects of our elimination of the benefit of allowing the low-voltage trouble maintenance and repair (TM&R) employees to take their service vehicles home at the end of their shifts.

WE WILL NOT fail or refuse to provide the Union with requested information that is relevant and necessary to the Union's performance of its duties as the exclusive collective-bargaining representative of employees in the unit described below, and/or fail to inform the Union that certain requested information did not exist.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce employees in the exercise of the rights set forth above.

WE WILL, on request, bargain collectively with the Union as the exclusive representative of the employees in the following appropriate unit concerning the effects of our decision to discontinue the benefit of allowing the low-voltage TM&R employees to take their service vehicles home after work, and if an understanding is reached, embody the understanding in a signed agreement:

All employees of Rochester Gas & Electric Corporation described in Section 1—Representation and Recognition, of the collective-bargaining agreement between Rochester Gas & Electric Corporation and the Union, which is effective from September 1, 2003 to May 31, 2008.

WE WILL pay each low-voltage TM&R employee the monetary value of his or her vehicle benefit, with interest.

WE WILL provide the Union with the information it requested on March 7 and June 5, 2006, namely, the cost to us of allowing the bargaining unit employees to have the benefit of taking a company vehicle home, a listing of all nonunit employees who have the benefit of taking a company vehicle home, and whether we announced to any nonunit employees that the benefit would be discontinued.

ROCHESTER GAS & ELECTRIC CORPORATION

*Linda Leslie, Esq.,* for the General Counsel.
*James R. LaVaute, Esq.,* of Syracuse, New York, for the Charging Party Union.
*James J. Gleason, Esq.,* of Binghamton, New York, for the Respondent Employer.

DECISION

STATEMENT OF THE CASE

WALLACE H. NATIONS, Administrative Law Judge. This case was tried in Buffalo, New York, on February 11, 2008. Local Union 36 Electrical Workers, AFL–CIO (Union) filed the original charge in this case on June 13, 2006. An amended charge was filed on June 15, 2006 and a second amended charge was filed on September 8, 2006. The Regional Director for Region 3 issued a complaint and notice of hearing (Complaint) on October 31, 2006.[1] The complaint alleges, inter alia, that Rochester Gas & Electric Corporation (Respondent, RG&E or Company) has engaged in certain conduct that is in violation of Section 8(a)(1) and (5) of the National Labor Relations Act (Act). Respondent filed a timely Answer to the Complaint wherein it admits, inter alia, the jurisdictional allegations of the Complaint.

On the entire record, including my observation of the demeanor of the witnesses, and after considering the briefs filed by the General Counsel, Charging Party and Respondent, I make the following:

FINDINGS OF FACT

I. JURISDICTION

The Respondent, a corporation, with its principal place of business in Rochester, New York, has been engaged in the generation, transmission, distribution and sale of electricity and natural gas. During the 12-month period ending October 31, 2006, Respondent, in conducting its business described above, derived gross revenues in excess of $250,000. During the same time period, Respondent purchased and received at its Rochester, New York, facility goods valued in excess of $50,000, directly from points outside the State of New York. The Respondent admits and I find that it is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act and that the Union is a labor organization within the meaning of Section 2(5) of the Act.

---

[1] All dates are in 2006 unless otherwise indicated.

II. ALLEGED UNFAIR LABOR PRACTICES

*A. The Complaint Allegations*

The complaint alleges and the Respondent admits that the following individuals held the positions opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act and agents of Respondent within the meaning of Section 2(13) of the Act:

Cathleen Frain          RGE/NYSEG Labor Relations
Richard Frank          Manager of Electrical Operations[2]

The complaint alleges and Respondent admits that at all material times, the Union has been the designated representative of Respondent's employees in the following unit which is appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

All employees of Respondent described in Section 1—Representation and Recognition, of the collective-bargaining agreement between Respondent and Union, which is effective from September 1, 2003 to May 31, 2008.

The complaint further alleges that on or about January 10, 2006, Respondent discontinued the practice of allowing certain unit employees to take a service vehicle home after work. It alleges that this practice relates to wages, hours, and other terms and conditions of employment of the unit and is a mandatory subject of bargaining. It also alleges that Respondent engaged in this conduct without prior notice to the Union and without affording the Union an opportunity to bargain with Respondent with respect to the effects of this conduct.[3]

In its answer, Respondent admits that on January 10, 2006, it discontinued the practice of requiring certain unit employees to take service vehicles home after work, but denies the other allegations of the preceding paragraph.

The complaint further alleges that on or about March 7, 2006, the Union, by letter, demanded bargaining over Respondent's decision to terminate the practice, (called benefit by the Union) noted above and requested that Respondent furnish the Union with the following information with respect to that benefit:

1. A listing of jobs and unit personnel that have the benefit;
2. Any Company analysis of the cost of this to the Company;
3. A listing of nonunit personnel who have the benefit, so that we may assess the significance of this issue to the Company; and,
4. Whether the Company announced to any nonunit personnel the same restriction now being imposed upon members of the bargaining unit.

The Complaint alleges that this information is necessary for, and relevant to, the Union's performance of its duties as the

exclusive collective-bargaining representative of the unit. The Complaint further alleges that on or about March 7, 2006, Respondent, by Cathleen Frain, by letter, failed and refused to furnish the Union with the information requested above. Respondent admits that the Union filed the information request, but denies the other allegations related to it.

*B. Facts Related to the Decision to End the Practice of Allowing Certain Employees to Take Company Vehicles Home and the Union's Response*

1. Facts related to the making of this decision

Richard Frank testified that the Company provides gas service to about 370,000 customers and electricity to about 280,000 customers in a nine county area around Rochester, New York. Frank is regional operations manager for Respondent. Within the geographic area of his responsibility, he manages the trouble maintenance and repair operation (TM&R) and also electrical construction of such things as substations. There are two groups of employees in TM&R, high voltage and low voltage. The high voltage group works with the overhead and underground electric transmission system with voltages as high as 35,000 volts, whereas the low voltage group primarily deals with residences with voltages under 480 volts. The high voltage crews use a material handling truck with a bucket attachment. These crews have never taken a Company vehicle home at night. When there is an emergency for them to handle, they report to the Respondent's Rochester, New York West Avenue facility and are dispatched in their trucks from that facility.

The low voltage group works on commercial and residential meter and service work. They do a lot of meter installations and meter change-outs. They do maintenance work on what is called a current transformer which uses voltages up to 480 volts. They do both scheduled and emergency work. The emergency work accounts for about 40 percent of the work of the low voltage group. In this group are eight employees, seven electric meter technicians and one electric meter inspector. On a day to day basis, the employees in this group work solo. They use a ¾ ton van in their work. These vans have two front seats with a bulkhead behind them to keep material in the rear from coming into the driver compartment. The vans are equipped with a computer and any materials the employee needs to do his work are in the rear of the van. Their work is divided into two shifts, one from 7 a.m. to 3 p.m. and the other from 3 to 11 p.m. Usually the first shift is manned by four to six employees, Monday through Friday. The second shift is manned by one or two employees normally, Monday through Friday. The Saturday and Sunday shifts are manned by one employee for each shift. Emergency work coming after 11 p.m. is handled by the high voltage crews.

Emergency situations can arise from employees calling in sick or storm situations. On these occasions, off duty employees may have to be called in. Employees are called in order from a list supplied to the Company by the Union. They can refuse the call out and in that event, the next person on the list is called. Prior to January 1, 2006, these employees took their service van home at night. If called in for an emergency while at home, they would drive the Company vans to the West Avenue facility to pick up the packet of material needed to do the

---

[2] Frank testified that his job title was manager of regional operations. Though it is relatively immaterial, I will accept Frank's version as he should know best what his job is titled.

[3] The complaint was amended at hearing to remove an allegation that Respondent did not afford the Union prior notice and an opportunity to bargain over its decision to cease the involved practice.

6                  DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

emergency work, then go to the worksite. The Company also provides a helper for emergency work and the low voltage employee would pick this person up at West Avenue. On what Frank termed "rare" occasions, the employee might be dispatched to a worksite without first going by the West Avenue facility.

Subsequent to January 1, 2007, the employees now always report to West Avenue for their van, material and a helper if needed. In November, 2005, Frank decided he wanted to end the practice of the employees taking their assigned vans home at night.[4] He testified that garaging them at West Avenue at night would be a cost savings to the Company. He was also concerned that having the Company trucks parked at employees' homes presented some sort of negative public reaction. He did not elaborate on this point. He also did not do any formal cost analysis of the savings associated with the decision.

He recommended to one of the Company's labor relations specialists, Cathleen Frain, that the practice be discontinued. He made the recommendation to her because he wanted to be sure he was allowed to do it under the collective-bargaining agreement. He made the request by email. The communication, dated November 3, 2005, reads:

    As you are probably aware, Operations across NY State is looking at reducing costs to meet budget constraints. One of the cost savings ideas for my group would be to have the 8 Low Voltage employees who currently take home their vehicles, park them here at West Ave now and commute back and forth to work in their personal vehicles. This makes good business sense in that these employees start their shift each day here at West Ave.

    These employees get called in from home approximately 1 time per month. If the call-in is storm related, they are reporting to West Ave. first to meet up with their rider anyway. One call-out per month doesn't constitute having their vehicles at their homes for emergency response. As mentioned above, they report to West Ave. each day at the beginning of their shift to get their work assignments for that day. They also have their morning tailboard at that time. Rarely do they have a job scheduled earlier than their start time.

    Currently, these employees would finish their last job for the day and head home from there. If they have to report back to West Ave. to drop off their vehicle, they would pretty much be leaving the worksite at about 30 minutes or so before the end of their shift in order to be back to West Ave. at the end of their shift. We're not 100 percent certain they are on the jobsite much past that anyway even if they are going home from the site.

    My recommendation is that you and I sit with Rick Irish[5] and give him a heads up that this is coming. The sooner the better. I would then communicate this to the 8 employees involved. I would like to pull the trigger on this as soon as 11/28/05. If we were to let the employees know next week, they would have nearly 3 weeks to prepare.

A chart introduced by the Respondent reflects the emergency call-outs for 2005. By months it shows for January, 6 call-outs. June and July, 2 call-outs for each month, August, 8 call-outs, September, 1 call-out, October, 4 call-outs and no call-outs in the other months.

2. Notice of the decision is given to affected employees and the Union responds

Frain approved the recommendation and Frank set a meeting for November 18, 2005, and explained the company's plans to the eight affected employees.

Steven Parnell is a low voltage employee of Respondent and a union steward. He is one of the employees affected by the decision to stop letting employees take home company vehicles. He attended a meeting on November 18 at Respondent's West Avenue facility. In attendance for management were Frank and Supervisor Jim Connell. The employees in attendance in addition to Parnell were Tom Eichle, Dick Shamp, Alford Smith, Tom Spratt, and Tony Proctor. All are electric field technicians, except for Smith, who is an electric meter inspector and all are considered low voltage employees. Frank informed the employees that as of January 1, 2006, they would no longer be allowed to take company vehicles home at night. Smith then asked Frank if management had considered other options such as charging the employees for taking the vehicles home at night. Smith added that he considered the benefit of taking the company vehicle home part of his compensation. Frank responded that the decision had already been made. Frank also noted that other employees under his management were similarly going to lose the use of company vehicles to get to and from work. Presumably these were nonunit employees. Parnell testified that he used the company vehicle about twice a year to answer emergency call-outs from his home. On these occasions, Parnell might report to the emergency directly or he might first go to the West Avenue facility.

Parnell was not allowed to take a company vehicle home after January 1, 2006. He had been taking one home since 1990. He did not have to buy gas for the company vehicle. The company withheld an amount from his pay to cover what the Internal Revenue Service deemed the value of the right to use the company vehicle to go to and from work. This value was considered to be income to the employee. An exhibit in this record lists the value or imputed income assigned for the years 2004 and 2005 for each affected employee. The annual values range from a low of $426 to a high of $663. For Parnell, the imputed income was listed as $597 for 2004 and $549 for 2005. Parnell lives about 17 miles from the involved company facility. He now uses his personal vehicle to get to the West Ave. facility.

Thomas Spratt is a low voltage employee of Respondent. As noted above, Spratt also attended the meeting with Frank.[6] According to Spratt, Frank gave as the reasons for taking away the Company vehicles budget cuts and restraints. Spratt remembered asking if other employees would also lose the use of company vehicles to go to and from work. According to Spratt,

---

[4] This practice had been in operation for about 29 years.
[5] Richard Irish is the Union's President.

[6] With this witness, the General Counsel indicated the date of the meeting was November 8, 2005, whereas with Parnell it was identified as taking place on November 18. Based on correspondence in the record, the correct date is November 18 2005.

Frank said, "Probably, this is just the start of it." Spratt lives about 25 miles from his place of work and had to take a personal vehicle out of storage and use it to go to work after his Company vehicle was taken away January 1, 2006. The imputed income for Spratt for the benefit of taking home the Company vehicle for 2004 was $645 and for 2005 was $636.

Spratt also testified that he was on a Company hiring committee in the spring of 2005. Also serving on this committee were employees Tony Proctor and supervisor Jim Connell. Spratt said there was a fourth member, but failed to identify him. This committee screened candidates for employment in two openings for electric meter technicians in their department. The candidates with the highest scores were offered employment. Spratt told each candidate that the use of a company vehicle to go to and from work was part of the job's compensation package. According to Spratt, supervisor Connell agreed with him.

Richard Irish is the President, Business Manager and Financial Secretary of the Union. The Union was certified at Respondent's facility in 2003 and the unit has 395 members. He testified that in November, 2005, he had a telephone conversation with Richard Frank. Frank informed Irish that effective January 1, 2006, Respondent would no longer allow the low voltage teams and meter men to take their service vehicles home at night. Instead, Respondent planned on garaging them at its West Avenue Facility. Irish responded that Respondent could not take this action unilaterally, but rather, was required to bargain over it as the existing benefit was a mandatory subject of bargaining. Frank said that he would relate the Union's position to Labor Relations and added, that the workers affected were not using the vehicles to answer emergency calls at night and when they did, they first reported to the West Avenue Facility anyway. Frank called the decision a good one and noted the expense to the Respondent involved in the employees using the vehicles to go to and from their homes and the West Avenue Facility. Irish did not conduct an investigation among the affected employees to determine if Frank were correct in his assertions.

Later on the same day, Irish spoke to Steve Parnell. Parnell informed him that he and other affected employees had a meeting with Frank where the loss of the benefit was announced. Parnell told Irish that the employees were upset about the decision as they would have to get another vehicle or find some other means to get to work.

On January 10, 2006, Irish sent a letter to Respondent's Labor Relations Analyst, Jay Shapiro, which stated that it was formal grievance, adding:

> This grievance is being filed in reference to January 1, 2006 requirement that Low Voltage TM&R employees with the Company with Company vehicles park the vehicles overnight at West Ave.
>
> This unilateral action was a violation of past practice. This removes the benefit of use of the vehicles for commuting to work and responding to callouts directly from home. Wages, benefits, hours and working conditions are mandatory topics of collective bargaining. The Company refused collective bargaining in this matter.

> The resolution to this instant case is that all affected members are made whole.

The Union met with the Company on three occasions to discuss the removal of the benefit. The first meeting took place on December 20, 2005. The meeting lasted 2 hours and the matter of the benefit was just one of a number of topics discussed. Appearing for the Respondent was Jay Shapiro and for the Union, IBEW International agent, Mike Flanagan and Irish. Irish testified that the discussion of the removal of the benefit took about 5 minutes. Irish did not remember the substance of the discussion. The next meeting where this matter was discussed took place in January 2006. Appearing for the Respondent were Cathleen Frain and Richard Frank. Appearing for the Union were Irish and employee-steward Steve Parnell. The portion of the meeting relating to the grievance took about 20 minutes. The Union pointed out that the cost of the decision to its affected members was about $5000-$6000 for transportation. There was no detailed explanation given for how this figure was calculated and it is not entirely clear whether Irish meant the figures given related to each individual affected employee or was for the whole group of eight employees combined. I would think the latter would be more likely. Irish noted that one of these affected members, Dick Shamp, had taken the job with Respondent at a pay cut as the use of the Company vehicle made up for the cut. He again pointed out that the removal of the benefit was a mandatory subject of bargaining. Respondent's representative took the position that it was a good business decision and that it had the right to remove the benefit under the contract.

There was a third step meeting held in July, 2006. Appearing for the Company were Frain, Shapiro, labor relations analyst George Savaker, Frank and his immediate boss, Walt Matias. Appearing for the Union were Irish, Parnell and then union Vice-President, Craig Rody. The Union reiterated its position that Respondent's decision was a mandatory subject of bargaining, and that the benefit had been explained to some job applicants as being part of the compensation for the job. The Union also took the position that by making the unilateral change in the involved benefit, the Respondent had violated the Act. The Company again took the position that it had the right to make the change under the contract and that it was a good business decision.

On March 7, Irish sent Frain the letter requesting information noted above at page 3 of this decision. Frain responded with a letter dated March 17, 2006, which stated:

> Respectfully the Company is not rescinding the determination it has made with regards to the Low Voltage TM&R group garaging their vehicles at night. I disagree with your characterization of the issue as being a benefit. This issue is currently in the grievance process and we will be willing to discuss your concerns within that forum. As for your request for information, we will provide you the information relevant to the matter.

> Irish testified that he sent this letter and another on June 5 in an attempt to get the Company to bargain over the removal of the vehicles, "have them bargain over some recompense, you

DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

know, some typ of compensation for removing the vehicles, . . .”

Irish wrote Frain again on June 5. This letter is practically identical to the one sent on March 7, with the difference being that he notes that Respondent had not yet complied with the information request as of the date of the later letter.

Frain responded with a letter dated July 10, which reads:

> This letter is in response to your letter dated June 5, 2006 requesting information regarding the Employer Vehicle Program. I have enclosed a report listing bargaining unit members, their job title and the company vehicle they have been assigned to take home at night. The company believes that it is not obligated to provide you with any financial information on company vehicle costs more does the company believe the Union's request for information on non-union employee vehicles is relevant or necessary to your duties and responsibilities.
>
> As stated in the company's March 17, 2006 response, we disagree with your characterization of this issue as a "benefit" and the company is not rescinding its determination to have these vehicles garaged at night.
>
> Please note that the information being provided is being provided for use by the Union strictly for the purposes of contract administration and/or collective bargaining. The information remains confidential and proprietary and may not be distributed or used for anything but the above stated purpose, without the written consent of the Company. If you have any questions on the information provided, please call me.

Respondent thus supplied the information requested in paragraph one of the information request, but no information was supplied for the other three paragraphs.

On July 21, 2006, Irish wrote to Shapiro, stating that the Union was withdrawing the grievance over the removal of vehicles and stating that it would pursue the matter before the NLRB.

Irish testified that he requested the information, including that for nonunit employees to see how many people were affected and what was the cost of the program to the Respondent. He testified the Union needed this information in order to develop a bargaining position. As he was not sure of the total number of employees affected, he was not sure what cost savings the Respondent might realize by the removal of the vehicles. He implied that the proposal might be affected by the total amount of the cost savings. Other than the information provided by Frain in her July 10 letter in response to paragraph 1 of the Union's request, Respondent has not made available any other information sought.

On July 10, Irish had a phone conversation with Shapiro who told him the Respondent did not see the relevance of the information sought about nonunit employees (Paragraphs 3 and 4 of the request). According to Respondent, Irish did not give either Shapiro or anyone else with the Company reasons why these two requests involving nonunit employees were relevant. I cannot find any evidence that Respondent asked the relevance. With respect to Paragraph 2 of the request, Irish was never told the Company could not afford to let the employees take Company vehicles home. Irish testified that the Respondent never

bargained or offered to bargain with the Union over the effects of the decision to remove the company vehicles from the eight employees who had been allowed to use them to go to and from work. Similarly, he testified that Respondent never offered any compensation to these employees for taking away the vehicles that they had been allowed to take home at night.

3. The relevant provisions of the collective-bargaining agreement

Irish was part of the negotiating team that reached the current collective-bargaining agreement. The parties, and primarily, Respondent makes some fairly broad contentions about Irish's testimony related to bargaining. I think it important to see exactly what Irish did say, which is not easy to summarize otherwise. This testimony was fragmented by numerous evidentiary objections from all parties. The testimony was given starting at page 25 of the transcript and questions are by Respondent's counsel and answers by Irish. The exchange, excluding objections and arguments reads:

> Q. In the course of bargaining for that agreement, you discussed, did you not, taking vehicles home—union members taking vehicles home, is that correct?
>
> A. Yes, we did.
>
> Q. You also discussed, in the course of that agreement that the—there would be certain rights that the company would retain with regard to work rules and work practices, did you not?
>
> A. Yes, we did.
>
> Q. As part of that agreement the union agreed, did they not, that the company was free to unilaterally change any work rule or any practice that had been ongoing at RG&E during the course of this collective bargaining agreement, except as provided in the agreement itself, is that right?
>
> A. No answer given as the parties engaged in a number of objections and counsel went to another question.
>
> Q. You bargained over the company's right to retain the ability to make certain unilateral changes with regard to work practices and work rules, did you not?
>
> A. yes, we did.
>
> Q. And, the result of that bargaining is set forth in the collective bargaining agreement, is it not?
>
> A. No answer was given as the parties again objected and counsel opted to ask another question.
>
> Q. You told us you bargained over the company's ability to make changes—unilateral changes with regard to certain work rules and certain work practices as they existed and the result of that bargaining is contained in the collective bargaining agreement itself, is it not?
>
> A. No answer was given and objections were made. Counsel chose to ask another question.
>
> Q. You bargained about work rules, did you not?
>
> A. Yes, we did.
>
> Q. You bargained about whether or not the company would have the right to make unilateral changes in work rules as they existed at RG&E, did you not?
>
> A. Yes, we did.
>
> Q. You arrived at an agreement with regard to that, did you not?

ROCHESTER GAS & ELECTRIC CORP.

A. Yes, we did.

Q. And that's reflected in the collective bargaining agreement, is that right?

A. Yes, it is.

Q. With regard to work practices, you bargained about that, did you not?

A. Yes, we did.

Q. And, you arrived at an agreement which would give the company certain rights with regard to making unilateral changes to work practices?

A. Objections were made and no answer was given. Counsel then asked another question.

Q. Did you bargain, during the course of the negotiations, about the company's right to make certain unilateral changes to existing work practices at RG&E?

A. Yes, we did.

Q. And the result of that bargaining is set forth in the collective bargaining agreement, is it not?

A. Yes, it is.

Q. With regard to just for the convenience of the judge, the agreements with regard to work practices and work rules are contained in Article 7 of the collective bargaining agreement, is that correct?

A. Yes, they are.

Q. Now, you also—let me back up for a second. You told me that you had recited the union's position on a number of occasions to the company with regard to this change in the practice of taking—the low voltage TMR people taking trucks home; isn't that right?

A. Yes, I did.

Q. I believe, and correct me if I am wrong, that the thrust of your discussions with the company was that you viewed that a benefit to be allowed to take the trucks home; is that right?

A. It was a benefit or compensation.

Q. And, in your mind was this dollar amount that there would be some value in taking the truck home so you didn't have to pay for a vehicle of your own to get work in the morning, is that right?

A. That's correct.

Q. And to get home at night too, right?

A. Yes.

Q. And, your view was that that was a benefit to the employees, right?

A. A benefit or compensation?

Q. A benefit and compensation?

A. Or compensation, to me they're kind of analogous terms.

Q. Meant the same thing to you?

A. Yes.

Q. During the course of negotiations for this collective bargaining agreement, Joint Exhibit No. 7, you bargained about benefits, did you not?

A. Yes, we did.

Q. And, the company retained certain—the company's position was that they should be able to retain certain rights with regard to changing those benefits unilaterally; isn't that right?

A. Would you ask that again, please?

Q. The company's position during the bargaining was that they should be able to retain the right to change benefits unilaterally, isn't that right?

A. I don't know if I agree that it was the company's position.

Q. You don't know what—you don't recall the company's position?

A. I don't recall that position.

Q. But you do remember this concept of benefits being discussed?

A. Yes.

Q. Let's set wages aside for a second, okay? There are certain things that the employees get by virtue of their employment at RG&E that have some economic benefit to them, is that correct?

A. Yes.

Q. That's aside from the wages that they earn, right?

A. That's correct.

Q. There are certain things like clothing allowance and some other things that just for an example of a benefit that employees get; is that right?

A. Yes.

Q. And that's separate and apart from their wages, right?

A. That's correct.

Q. This benefit or let me ask it another way, taking a vehicle home after work, is that one of those benefits that you get that's separate and apart from your wages, if you're in that category?

A. It's a benefit or compensation separate and apart from wages.

Q. Taking the concept of wages out of it for a second, all right, it's a benefit in terms of something that they get that's of value apart from their wages: is that right?

A. Yes.

Q. During the course of the negotiations that you had with the company to arrive at this collective bargaining agreement, you discussed this concept of benefits that were separate from the compensation, right?

A. Yes we did.

Q. You arrived at an agreement with regard to that, is that right?

A. Yes, we did.

Q. The agreement that you arrived at with regard to benefits is set forth in Article 25 of the collective bargaining agreement that's in front of you, is that correct?

A. Yes, it is.

The next questioning of Irish on the subject of negotiation was by General Counsel.

Q. If you would refer to Joint Exhibit 7, and specifically Article 7. In the first paragraph, there is a reference to a joint committee?

A. That's correct.

Q. Do you know who was on that Joint Committee?

A. No, I do not.

10    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Q. In the terms of the article on benefits, were vehicles ever discussed?

A. Objections were made and no answer was given. Another question was asked.

Q. So were vehicles ever discussed in relation to benefits?

A. I don't remember vehicles being discussed in relation to Article 25.

The next questions about negotiations of Irish were asked by counsel for the Union.

Q. Mr. Irish, in the course of the negotiations, I'm referring to Article 7 here, was there any discussion in the negotiations about the interplay or how you reconciled the first paragraph of Section A with the second paragraph of Section A; was there any discussion about that?

A. I don't recall a discussion of how they interplayed.

Q. In the course of negotiations did the company ever state to the union that it retained the right to withdraw the take-home vehicles?

A. No they did not.

Article 7 of the collective-bargaining agreement states:

(7) SAFETY AND WORK RULES

(A) It is understood and agreed that there are in existence specific safety and/or work rules, customs, regulations, or practices which reflect detailed application of subject matters within the scope of this Agreement and which are consistent with it. It would be impractical to set forth in this Agreement all of these rules, customs, regulations, and/or practices, or to state which of these matters may have been eliminated. A joint committee will be formed to review safety and work rules, customs, regulations, and practices. It is understood and agreed that if a dispute arises as to the existence or enforceability of a specific safety or work rule, custom regulation, or practice, such dispute shall not be subject to the grievance and arbitration provisions of this Agreement, but shall instead become the exclusive concern of the Director of Human Resources for the Company and the International Representative of the Union or their specifically authorized deputies.

In addition, it is understood and agreed that the Company shall have the exclusive right to issue, amend, and revise safety and/or work rules, customs, regulations, and practices, except as expressly modified or restricted by a specific provision of this Agreement. This provision shall include job specifications for the classifications which were recognized by the NLRB Certification dated April 11, 2003, Case No. 3–RC–11307, except as expressly modified or restricted by a specific provision of this Agreement.

Paragraphs (B) and (C) of this Article are confined to safety rules and safety training and are not relevant to the issue under consideration.

Article (8) MANAGEMENT RIGHTS AND RESPONSIBILITIES

It is mutually understood and agreed by the parties to this Agreement that: except as expressly modified or restricted by a specific provision of this Agreement, all statutory and inherent managerial rights, prerogatives, and functions are retained and vested exclusively in the Company, including but not limited to the rights, in accordance with its sole and exclusive judgment and discretion to reprimand, suspend, discharge, and otherwise discipline employees for just cause; to determine the number of employees to be employed; to hire employees, determine their qualifications and assign and direct their work; to promote, demote, transfer, lay off, recall employees to work; to set the standards of productivity, the products to be produced and/or the services to be rendered; to maintain the efficiency of operations; to determine personnel, methods, means, and facilities by which operations are conducted; to determine the size and number of crews; to determine the shifts to be worked; to use independent contractors to perform work or services; to subcontract, contract out, close down, or relocate the Company's operations or any part thereof; to expand, reduce, alter, combine, transfer, assign, or cease any job, department, operation or service; to regulate the use of machinery, facilities, equipment, and other property of the Company; to introduce new or improved research, production, service, distribution, and maintenance methods, materials, machinery, and equipment; to determine the number, location and operation of departments, divisions, and all other units of the Company; to issue, amend and revise reasonable policies, rules, regulations, and practices not in conflict with any express provisions of the collective bargaining agreement; and to direct the company employees. The Company's failure to exercise any right, prerogative, or function hereby reserved to it, or the company's exercise of any such right, prerogative, or function in a particular way, shall not be considered a waiver of the Company's right to exercise such right, prerogative, or function or preclude it from exercising the same in some other way not in conflict with the express provisions of this Agreement.

The parties at hearing referred to Article 25 as the Benefits Article in error. Article 25 is a one line article dealing with the Company's Pension. Article 26 is a one line Article dealing with the Company's 401(k) plans. Article 24 deals with benefits other than pension or 401(k). It reads:

(2) BENEFITS (other than Pension or 401(k))

During the term of this Agreement, the Company will provide "General Benefits" and "Benefit Plans" described in the "Rochester Gas and Electric Union Employee Benefit Handbook", subject to the terms and conditions of the plan documents. The terms of the plan documents, including the summary plan descriptions are specifically incorporated herein by reference.

Except as set forth below, it is understood and agreed that during the term of this Agreement the Company (consistent with the plan documents) shall have the exclusive and unilateral right to issue, amend, revise or terminate any or all benefits and benefit plans:

There follows four numbered paragraphs dealing with medical plans and flex fit credits, none of which are relevant to the issued involved in this case.

Though the parties discussed the matter of employees taking

home Company vehicles, it is not mentioned in the agreement. The only mention of vehicles I find is in Article 16 which deals with overtime. The last sentence of this Article reads. "The Company may require employees to take home vehicles."

*C. Discussion and Conclusion with Respect to the Issues.*

1. Did the Respondent violate the Act by refusing to bargain over the effects of its decision?

Wages, hours and other terms and conditions of employment are mandatory subjects of bargaining, which cannot be changed by an employer without providing the union with timely notice and an opportunity to bargain. *NLRB v. Katz,* 369 U.S. 736, 743 (1962); *NLRB . Borg-Warner Corp.,* 356 U.S. 342 (1958). Making unilateral changes in mandatory subjects of bargaining "circumvent[s] . . . the duty to negotiate which frustrates the objectives of Section 8(a)(5) as much as does a flat refusal." *Katz,* at 743. The effects on employees of losing the benefit of a service vehicle to drive to and from their residences is a mandatory subject of bargaining as it relates to their wages and conditions of employment.

The Respondent has argued that the Union has waived its right to this statutory mandate to bargain over unilateral changes by its agreement to the parties' collective-bargaining agreement. Whether that is correct or not is moot as the General Counsel has amended the Complaint to remove the allegation that Respondent was obligated to bargain over its decision to cease the practice of allowing the low voltage workers to use its vehicles to commute to and from work.

On the other hand, there remains the issue of whether Respondent was obligated to bargain with the Union over the effects of its decision. Under Board law, I find that Respondent was obligated to give the Union notice and an opportunity to bargain about the effects on unit employees of its decision to eliminate the benefit of the employee's use of Company vehicles to go to and from work and home. That is true even if it had no obligation to bargain about the decision itself. *Good Samaritan Hospital,* 335 NLRB 901, 902 (2001); *Kiro, Inc.,* 317 NLRB 1325, 1327 (1995). In *Good Samaritan Hospital,* the Board held that contractual language that waives the union's right to bargain about a decision is not a waiver of its right to bargain about that decision's effects. Id. at 902. Specifically, in *Good Samaritan Hospital,* the Board found that the language in the parties' collective-bargaining agreement waived the union's right to bargain over the hospital's decision to change its staffing matrix, but did not waive the union's right to bargain over the effects of this decision. Id. at 901–903. The Board found that the hospital's decision impacted the employees' terms and conditions of employment and that the hospital had to bargain over these effects. Id. at 903–904.

Here Respondent's decision had a substantial monetary effect on the affected employees. Whether one accepts the Respondent's own estimate of the value to the employees of its practice, the value or income imputed to the employees because of their use of Respondent's vehicles to commute to work, or the higher $5000 to $6000 figure asserted by the Union or something in between, the value was substantial. The costs

incurred by the employees as a result of the decision included providing a vehicle to replace the one provided by Respondent, and paying the maintenance, insurance and gasoline costs for the vehicle. It is obvious to anyone who drives a car these days that these costs are very real and substantial. Thus, the effects of Respondent's decision included changes to employees' terms and conditions of employment in ways that were material, substantial and significant. It is clear that Respondent realized the truth of this as the value of the use of the Company vehicle was considered income by Respondent and was represented to prospective employees and relied upon by some of those taking involved jobs, as being part of their total compensation. As such, Respondent had a duty to bargain over the effects of the decision. *Kiro, Inc.,* supra; *Union Child Day Care Center,* 304 NLRB 517 (1991)(finding that the employer violated Section 8(a)(5) of the Act by unilaterally discontinuing its practice of allowing employees to use a company vehicle to obtain their lunches); *Yellow Cab Co.,* 229 NLRB 1329, 1333, 1354 (1977) (finding that the employer violated Section 8(a)(5) of the Act by unilaterally changing its policy allowing employees to use their cab for transportation to and from work).

I cannot find any evidence that the Union has clearly and expressly waived its right to bargain over the effects of the Respondent's decision. Nothing in the evidence relating to the negotiations for collective bargaining speaks to any intent by the Union to consciously waive its right to effects bargaining and the collective-bargaining agreement is silent as to effects bargaining, though arguably giving the Respondent the right to unilaterally make changes in otherwise mandatory subjects of bargaining. Clearly there were no negotiations over the effects of the decision to take away the private use of Respondent's vehicles by low voltage employees and there is no language dealing with this issue in the collective-bargaining agreement. The Supreme Court, in *Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 708 (1983), held that it would not "infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated. '" The Board has held that to meet the clear and unmistakable standard, "the contract language must be specific, or it must be shown that the party alleged to have waived its rights consciously yielded its interest in the matter." *Allison Corp.,* 330 NLRB 1363, 1365 (2000). Furthermore, in addressing effects bargaining, the Board has held that it must be clear and unmistakable that effects bargaining is being waived. *Good Samaritan Hospital,* supra at 902.

None of the contractual provisions, Article 7, Article 24 or Article 8, all set forth in their relevant entirety above, address the effects of taking any action under their wording nor do they address the removal of service vehicles at all. There is nothing that clearly gives Respondent the right to avoid effects bargaining from any action it might take in reliance on these Articles. There is nothing in the evidence in this record about any negotiations that deals with effects bargaining. I find that Respondent has failed to meet its burden that the Union clearly and unmistakably waived its right to bargain over the effects of Respondent's unilateral removal of the low voltage employees long-standing benefit.

Likewise it is clear that the Union timely and continuously

12                                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

requested to bargain over the matter. Irish made clear requests for bargaining in his November 2005 telephone conversation with Frank, in his meeting with Respondent's representatives in December 2005, and again in its official grievance over the matter submitted on January 10, 2006. The grievance in part states:

> "This unilateral action was a violation of past practice. This removes the benefit of the use of vehicles for commuting to work and responding to callouts directly from home. Wages, benefits, hours and working conditions are mandatory subjects of collective bargaining. The Company refused collective bargaining in this matter. The resolution to this instant case is that all affected members be made whole."

The grievance is clear that the loss of a benefit of using the vehicles for commuting purposes is at issue and equally clear is the fact that, inter alia, the Union is seeking compensation for the losses its members incurred as a result of Respondent's decision. At both grievance meetings in January and July 2006, Irish repeated the Union's position that Respondent's conduct was a unilateral change and that hours, wages and conditions of employment were mandatory subjects of bargaining. The Union also maintained that position in its letters of March 7 and June 5, 2006. During the grievance meetings, Irish informed Respondent that the use of Company vehicles was part of the employees' compensation and that its loss was costing the employees $5000 to $6000 annually. I find that this makes perfectly clear that the Union was seeking an effects remedy in addition to seeking bargaining over the decision itself. On the issue of waiver, The Board has held that "[i]n the absence of a clear and unmistakable waiver by the union concerning effects bargaining, such bargaining is still required." *Good Samaritan Hospital,* supra at 902. Though I find that it is clear that the Union here requested both effects and decision bargaining, the Board has held that no magic words are required to establish a demand to bargain. They made it clear that the loss of the vehicle for commuting to work and the costs associated with that loss were substantial. Implicit in such a position is that a remedy is due to the employees for the effects of the lost benefit. *AT&T Corp.,* 325 NLRB 150 (1997); *Legal Aid Bureau,* 319 NLRB 159 fn. 2 (1995). Any argument by Respondent that the practice of letting the low voltage employees use their Company vehicles to commute is not a benefit, as was made in the testimony, is disingenuous as their best argument for waiver with respect to the decision to discontinue the practice is found in the section of the collective-bargaining agreement dealing with benefits.

In conclusion, I find that Respondent violated Section 8(a)(5) of the Act by refusing to bargain with the Union over the effects of its decision to cease the practice and benefit of allowing the low voltage employees to use their Company vehicles to commute to and from work.

2. Did Respondent violate Section 8(a)(5) of the Act by refusing to supply the Union with requested information?

Though Respondent did supply one part of the Union's information request, it continues to refuse to supply the following portions of it:

Any Company analysis of the cost of this to the Company;

A listing of non-unit personnel who have the benefit, so that we may assess the significance of this issue to the Company; and,

Whether the Company announced to any non-unit personnel the same restrictions now being imposed upon the members of the bargaining unit.

The Respondent has informed the Union that it does not consider the last two requests to be necessary and relevant to the Union's duties as representative of the unit employees and with respect to the first one, has stated that no analysis of the costs associated with its decision has been made. This latter information was first given at the hearing in this case and was not given to the Union prior to the hearing.

With respect to the cost request, General Counsel asserts that the Union is seeking an analysis of the cost to the Company of providing service vehicles to bargaining unit personnel, not an analysis of the cost savings achieved by taking the service vehicles away. I would agree though would note they might be the same thing. Whether any formal analysis was performed or not, the underlying cost information is available. Certainly the Respondent thought there were cost savings to be achieved by stopping the longstanding practice of letting the low voltage employees take Company vehicles home at night. Budget constraints and budget cuts were the reasons given to employees when they were informed of the Company's decision. I find that such information is highly relevant and necessary to the Union to be able to effectively bargain with the Company over the effects of its decision. Whether the costs are associated with increased mileage on the vehicles, increased maintenance costs or increased fuel costs are all matters within the knowledge of the Respondent. If it did not understand what the Union was seeking, it could have sought a clarification, but instead it simply chose to not comply without giving a legitimate reason.

Respondent is obligated to furnish the Union with information about the cost of providing the benefit to bargaining unit employees. Information relating to wages, hours and working conditions of employees in the bargaining unit is presumptively relevant. *North Star Steel Co.,* 347 NLRB 1364, 1364, 1368 (2006). Accordingly, the Board has held that financial information related to the cost of providing benefits to the bargaining unit is presumptively relevant for purposes of collective bargaining and must be furnished upon request. *E.I. Dupont & Co.,* 346 NLRB 553, 577 (2006); *V&S Schuler Engineering,* 332 NLRB 1242 (2000). There is no contention made in the evidence that such information does not exist and common knowledge would affirm that it does exist. Simply stating some years after the request was made that no analysis was made is just not sufficient. Respondent has violated the Act by not complying with this request.

With respect to the information sought concerning nonunit personnel, I believe this information is similarly necessary and relevant for the Union to properly represent the involved unit employees. Frank announced to the low voltage employees that ceasing the practice of letting them use their Company vehicles to commute to and from work was just the start of similar steps the Company intended to take. Thus he opened the door to

legitimate inquiry by the Union as to the scope of Respondent's cost savings program. With respect to information pertaining to employees outside the bargaining unit, the Union must demonstrate the information is relevant. *National Grid USA Service Co.,* 348 NLRB 1235 (2006). The burden in demonstrating relevance is "not exceptionally heavy." *Leland Stanford Junior University,* 262 NLRB 136, 139 (1982). The Union need only show a "probability that the desired information was relevant, and that it would be of use to the union in carrying out its statutory duties and responsibilities. *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 437 (1967).

The Union's information request was based on Respondent's representations regarding the reason it eliminated the vehicle benefit. Frank notified the low voltage employees that they were losing the use of the vehicles and in doing so indicated that it was a cost savings measure and that other employees would also lose the use of the vehicles. Frank made similar assertions to Irish. On this basis, the Union stated in its request, that it needed the information to "assess the significance of this benefit and its cost to the company and to aid the Union in responding to employer demands to terminate the benefit." The information relating to nonunit personnel would demonstrate the significance of the benefit, including whether the change was going to be instituted Company-wide or if it was only being applied to the low voltage members of the bargaining unit. This information would aid the Union in bargaining over the effect of losing the benefit, as it would clarify its impact on Respondent and assist the Union in preparing bargaining proposals. It would clearly affect the Union's bargaining position as it relates to the size of the cost savings sought by Respondent, whether minimal in the case of the low voltage employees or substantial if a number of nonunit employees were similarly losing the use of Company vehicles for their commute. I believe the Unions approach would be different in one case versus the other. Further, other than its claim of non relevance, Respondent has offered no reason why it cannot supply the information or what harm could result if it did. Relevancy of the information is also established by Frank's statements that the removal of the benefit was a cost savings measure that would be borne by other employees as well. The requested information would verify the assertion that Frank made to the low voltage employees.

I find that Respondent has violated the Act by not providing the information sought with respect to nonunit employees.

3. Deferral is not appropriate in the circumstance of this case

On brief and in its answer, Respondent urges deferral of this case to the parties' grievance and arbitration procedures. I think deferral in this case is inappropriate for two reasons. First, the use of take home Company vehicles at employer expense is a non-contractual term and condition of employment. The grievance and arbitration procedure allows processing only of an alleged "violation of the specific terms of this Agreement." Section 10(A). It states:

No other matter may be submitted to the grievance and arbitration procedure.

Work rules, customs, regulations, or practices which reflect detailed application of subject matters within the scope of this Agreement" are excluded from the grievance and arbitration procedure. Section 7 (A). Deferral is not appropriate here because the arbitration clause in the collective-bargaining agreement does not cover the item at issue.

Second, deferral is not appropriate as the Complaint alleges violations of Section 8(a)(5) of the Act for failing and refusing to provide information. *Postal Service,* 302 NLRB 767 (1991); *DaimlerChrysler,* 344 NLRB 1324 fn. 1 (2005). The Board held in *DaimlerChrysler Corp.* that "under the Board's decision in *Postal Service,* (citation omitted), the 8(a)(5) complaint allegations concerning failure to provide requested information are not appropriate for deferral pursuant to *Collyer Insulated Wire,* 192 NLRB 837 (1971). Id. at fn. 1. Thus the information request allegations are not deferrable. Insofar as deferring the other allegation of this Complaint, the Board has held that it does not favor piece-meal deferral and prefers to have an entire dispute resolved in a single proceeding. *DaimlerChrysler Corp.,* supra.

CONCLUSIONS OF LAW

1. Respondent, Rochester Gas & Electric Corporation, is an employer engaged in commerce within the meaning of Section 2(2), (6) and (7) of the Act.

2. Local Union 36, International Brotherhood of Electrical Workers, AFL–CIO is a labor organization within the meaning of Section 2(5) of the Act.

3. By failing to timely notify the Union and afford it an opportunity to bargain over the effects of discontinuing the benefit of allowing the low voltage TM&R employees to take their service vehicles home after work, Respondent has violated Section 8(a)(1) and (5) of the Act.

4. By failing and refusing to provide the Union with the information it requested on March 7, and June 5, 2006, namely, the cost to Respondent of allowing the bargaining unit employees to have the benefit of taking a company vehicle home, a listing of all employees who have the benefit of taking a company vehicle home, and whether Respondent announced to any employee or group of employees not in the bargaining unit that the benefit would be discontinued, and by failing to inform the Union that certain requested information did not exist, Respondent violated Section 8(a)(1) and (5) of the Act.

5. The unfair labor practices committed by Respondent affect commerce within the meaning of Section 2(6) and (7) of the Act.

REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I find that it must be ordered to cease and desist and to take certain affirmative action designed to effectuate the policies of the Act.

Respondent should be ordered to, on request, bargain collectively with the Union concerning the effects of its decision to discontinue the benefit of allowing the low voltage TM&R employees to take their service vehicles home after work. It should further be ordered to make whole its employees for any losses they may have suffered as a consequence of its decision

14                                         DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

to eliminate the vehicle benefit, with interest as computed in *New Horizons for the Retarded,* 283 NLRB 1173 (1987). Respondent should further be ordered to furnish the Union with the information it requested on March 7 and June 5, 2006, which is relevant and necessary to the Union's duties as statutory representative of the Respondent's employees. And last, Respondent should be ordered to post an appropriate notice.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[7]

ORDER

The Respondent, Rochester Gas & Electric Corporation, Rochester, New York, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Failing to timely notify the Union and afford it an opportunity to bargain over the effects of discontinuing the benefit of allowing the low voltage TM&R employees to take their service vehicles home after work;

(b) Failing and refusing to provide the Union with requested information relevant to the effects of its decision to discontinue the benefit of allowing the low voltage TM&R employees to take their service vehicles home after work, and/or failing to inform the Union that certain requested information did not exist, so as to enable the Union to discharge its function as statutory representative of Respondent's employees; and,

(c) In any like or related manner interfering with, restraining, or coercing employees in the exercise of rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act

(a) On request, bargain collectively with the Union concerning the effects of its decision to discontinue the benefit of allowing the low voltage TM&R employees to take their service vehicles home after work.

(b) Make whole its employees for any losses they may have suffered as a consequence of the Respondent's refusal to bargain over the effects of its decision to eliminate the vehicle benefit.

(c) Furnish the Union with the information it requested on March 7 and June 5, 2006, which is relevant and necessary to the Union's duties as statutory representative of the Respondent's employees.

(d) Preserve and within 14 days of a request, or such additional time as the Regional Director may allow for good cause shown, provide at a reasonable place designated by the Board or its agents, all payroll records, social security payment records, timecards, personnel records and report, and all other records, including an electronic copy of such records if stored in electronic form, necessary to analyze the amount of money due under the terms of this Order.

(e) Within 14 days after service by the Region, post at its facility in Rochester, New York, copies of the attached notice

marked "Appendix."[8] Copies of the notice, on forms provided by the Regional Director for Region 3, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places including all places where notices to employees are customarily posted. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by the Respondent at any time since June 13, 2006.

(f) Within 21 days after service by the Region, file with the Regional Director a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C.  June 12, 2008

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT do anything that interferes with, restrains or coerces you with respect to these rights. More specifically,

WE WILL NOT refuse to give the Union all the information it requested on March 7 and June 5, 2006, concerning the elimination of the benefit of allowing the low voltage TM&R employees to take their service vehicle home at the end of their shift and/or fail to inform the Union that certain requested information does not exist.

WE WILL NOT refuse to bargain with the Union over the effects of our elimination of the benefit of allowing the low voltage TM&R employees to take their service vehicle home at the end of their shift.

WE WILL make whole all low voltage TM&R bargaining unit members who previously enjoyed the benefit of taking their service vehicle home for any losses incurred as a result of our

---

[7] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

[8] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

ROCHESTER GAS & ELECTRIC CORP.

15

elimination of this benefit.

WE WILL bargain with the Union over the effects of our decision to eliminate the benefit of allowing low voltage TM&R employees to take their service vehicle home at the end of their shifts.

WE WILL provide the Union with the information it requested on March 7 and June 5, 2006, namely, the cost to Respondent of allowing the bargaining unit employees to have the benefit of taking a company vehicle home, a listing of all employees who have the benefit of taking a company vehicle home, and whether Respondent announced to any employee or group of employees not in the bargaining unit that the benefit would be discontinued.

ROCHESTER GAS AND ELECTRIC CORP.

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

Local Union 36, International Brotherhood of
Electrical Workers, AFL–CIO )

        Petitioner, )     **CERTIFICATE OF SERVICE**

        v. )     Docket No. _____

National Labor Relations Board, )

        Respondent. )

        I hereby certify under penalty of perjury that on August 26, 2010, I served a copy of the Petition for Review filed with this Court the same day by UPS Next Day delivery and by electronic mail on the following parties:

> James S. Gleason, Esq.
> Counsel for Rochester Gas & Electric Corporation
> Hinman, Howard & Kattell, LLP
> 700 Security Mutual Building
> 80 Exchange Street
> P.O. Box 5250
> Binghamton, New York 13902-5250
> jgleason@hhk.com
>
> Linda Dreeben, Esq.
> Deputy Associate General Counsel
> Appellate Court Branch
> National Labor Relations Board
> 1099 14th St. N.W.
> Washington, D.C. 20570-0001
> appellatecourt@nlrb.gov
> linda.dreeben@nlrb.gov

Linda M. Leslie, Esq.
Counsel for the General Counsel
National Labor Relations Board, Region 3
Niagara Center Building, Suite 630
130 South Elmwood Avenue
Buffalo, New York 14202
linda.leslie@nlrb.gov

Dated: August 26, 2010                    BLITMAN & KING LLP


/s/  James R. LaVaute
James R. LaVaute, Esq.
*Attorneys for Petitioner*
Franklin Center, Suite 300
443 North Franklin Street
Syracuse, New York 13204
Telephone: (315) 422-7111
Facsimile:  (315) 471-2623
jrlavaute@bklawyers.com